# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHARLES EDWARD TURNER, JR.,   )
                                   )
             Plaintiff,     )
                                   )
     v.                    )          1:15CV947
                                   )
MR. CLELLAND, et al.,        )
                                   )
             Defendants.    )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge on Plaintiff's Motion to Compel Discovery (Docket Entry 31) (the "Discovery Motion") and Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment (Docket Entry 32) (the "Dismissal Motion"). For the reasons that follow, the undersigned will deny as moot the Discovery Motion and recommend that the Court grant in part and deny in part the Dismissal Motion.

## BACKGROUND

Plaintiff, a North Carolina prisoner, formerly incarcerated at the Albemarle Correctional Institution ("ACI"), filed a Complaint against ACI Superintendent "Mr. Clelland" ("Defendant Clelland"), ACI "C/O Mr. Curry" ("Defendant Curry"), ACI "Case Manager Ms. Huneycutt" ("Defendant Huneycutt"), and the North Carolina Department of Public Safety (the "NCDPS") "Director of Chaplaincy Services Ms. Betty Brown" ("Defendant Brown," collectively with

Defendant Clelland, Defendant Curry, and Defendant Huneycutt, the "Defendants"),[1] alleging violations of his federal constitutional rights and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. ("RLUIPA"). (Docket Entry 1 at 1-3.)[2] After Defendants filed their Answer (Docket Entry 26), the parties engaged in discovery (see Text Order dated April 22, 2016).

## DISCOVERY MOTION

Through the Discovery Motion, Plaintiff asserts that, on April 26, 2016, and May 1, 2016, he sent Defendants two discovery requests, "requesting 7 documents and asking 3 questions." (Docket Entry 31 at 1.) Plaintiff filed the Discovery Motion on June 13, 2016, asserting that, as of June 7, 2016, he had not received Defendants' responses to his discovery requests. (Id.) The

---

[1] The Complaint asserts an action against "NCDPS Director of Chaplaincy Services Ms. Betty Brown" (Docket Entry 1 at 2), but Plaintiff requested the issuance of a summons to both "Ms. Betty Brown, North Carolina Department of Public Safety: Chaplain" and "N.C. Dept. of Public Safety Chaplaincy Services Director (Betty Brown)" (Docket Entry 14 at 7-10). Accordingly, the Dismissal Motion treats "Betty Brown" and "NCDPS Director of Chaplaincy Services" as separate defendants. (Docket Entry 34 at 1.) For purposes of this Memorandum Opinion, Order, and Recommendation, the undersigned elects to construe them as a single defendant (i.e. Defendant Brown).

[2] Citations herein to Docket Entry pages utilize the document's internal pagination if unified internal pagination exists. In the absence of such pagination, the Docket Entry page citations utilize the CM/ECF footer's pagination. Additionally, many of Plaintiff's filings are hand-written in small-caps. (See, e.g., Docket Entry 1.) For legibility purposes, the undersigned reproduces Plaintiff's filings in regular typeface.

Discovery Motion thus seeks "an order to compel a discovery response from the Defendant(s)." (Id.)

On June 20, 2016, Defendants filed a response to the Discovery Motion (Docket Entry 36), and "provided Plaintiff with responses to his discovery requests with limited objections as to scope, relevancy, and confidentiality" (id. at 2; see also Docket Entry 36-2 (Defendants' discovery responses)). Plaintiff did not file a reply or otherwise challenge the sufficiency of Defendants' responses to his discovery requests. (See Docket Entries dated June 20, 2016, to present.)

Given that Defendants have now provided responses to Plaintiff's discovery requests, and Plaintiff has not contested the adequacy of those responses, the undersigned deems as moot the Discovery Motion, without prejudice to Plaintiff's right to renew the Discovery Motion should grounds for any challenge exist. Further, if Plaintiff can show that he actually incurred some expenses (e.g., mailing) in bringing the Discovery Motion, the Court will entertain his request in that regard.[3]

---

[3] "[I]f the disclosure or requested discovery is provided after the motion [to compel] was filed[, ]the [C]ourt must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A).

## DISMISSAL MOTION

Shortly after Plaintiff filed the Discovery Motion (Docket Entry 31), Defendants filed the Dismissal Motion (Docket Entry 32). Through the Dismissal Motion, Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies with respect to certain of his claims, against certain Defendants (Docket Entry 34 at 10-14), (2) Plaintiff's transfer to another prison moots his requests for injunctive relief, thus defeating his RLUIPA claim(s) (id. at 23-24), (3) sovereign and Eleventh Amendment immunities bar Plaintiff's claims for monetary damages against Defendants in their official capacities (id. at 21-23), (4) the Complaint fails to state a claim against Defendant Curry (id. at 14-20), and (5) qualified immunity bars Plaintiff's claims for monetary damages against Defendant Curry in his individual capacity (id. at 20-21). In support of the Dismissal Motion, Defendants submitted Plaintiff's Public Access Information Sheet (Docket Entry 34-1), the affidavit of Finesse G. Couch, Executive Director of the North Carolina Inmate Grievance Resolution Board (the "IGRB") (the "Couch Affidavit") (Docket Entry 33), and four of Plaintiff's inmate grievances (Docket Entries 33-1, 33-2, 33-3, 33-4).

Plaintiff filed a response in opposition to the Dismissal Motion (the "Opposition"). (Docket Entry 39 at 1-12; see also id. at 16 (attesting to Opposition under penalty of perjury).) Through the Opposition, Plaintiff argues that: (1) the Dismissal Motion

4

should be treated as a motion for judgment on the pleadings under Rule 12(c), and the Court should not consider Defendants' documentary evidence in support of the Dismissal Motion (id. at 2-3); (2) the Court has already determined under the Prison Litigation Reform Act, 42 U.S.C. § 1997e (the "PLRA"), that the Complaint withstands dismissal, rendering the Dismissal Motion "moot" (id. at 3); (3) he could not exhaust his administrative remedies with respect to certain of his claims and against certain Defendants because, for various reasons, the grievance process was not "available" to him and/or futility obviated the need for exhaustion (id. at 5-9); (4) the Dismissal Motion "should have been filed before [Defendants] filed an [a]nswer as it regards [q]ualified [i]mmunity and surely before 'commencement of discovery,'" and "[Defendant] Curry is not entitled to [q]ualified [i]mmunity" (id. at 11); (5) "Plaintiff does not seek to recover damages under the theory of[] Responde[a]t Superior or Supervisory Liability" (id. at 12); and (6) "[t]he decisions made by [Defendant Brown] affect every prison in North Carolina and will affect Plaintiff until [July 2, 2018]," Plaintiff's projected release date (id. at 12; see also Docket Entry 34-1 at 1 (identifying Plaintiff's projected release date as July 2, 2018)).[4]

_____

[4] Plaintiff submitted nine exhibits in support of the Opposition. (Docket Entry 39-2 at 1-9.) Plaintiff also included a Supplemental Pleading (Docket Entry 39 at 12-16 (the "Supplemental Pleading") in the same document as the Opposition, purportedly filed pursuant to Rule 15(d) (id. at 12), setting out

## I. Applicable Standard

Plaintiff first contends that the Court should treat the Dismissal Motion as a motion for judgment on the pleadings and that the Court should not consider Defendants' documentary evidence in support of the Dismissal Motion. (Docket Entry 39 at 2-3.) In this case, both Plaintiff and Defendants submitted documents outside of the pleadings concerning the issue of exhaustion of administrative remedies. (See Docket Entries 33, 33-1, 33-2, 33-3, 33-4, 34-1, 39-2.) Because these documents contain information not referenced in the Complaint, the Court should convert the Dismissal Motion into a summary judgment motion (on the issue of exhaustion). See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); see also Dillon v. Rogers, 596 F.3d 260, 271 (5th Cir. 2010) (concluding that "when courts rule on exhaustion on the basis of evidence beyond the pleadings, the

---

certain "[t]ransactions, [o]ccurrences and [e]vents" (id. at 13) that allegedly arose after Plaintiff filed the Complaint, but which do "not provide any new [c]laims or [p]arties" (id. at 12). Pursuant to Rule 15(d), "[o]n motion and reasonable notice, the [C]ourt may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Here, Plaintiff did not submit a motion with the Supplemental Pleading. (See Docket Entry 39; see also Docket Entries dated July 5, 2016, to present.) Under these circumstances, the undersigned elects not to consider any new allegations raised in the Supplemental Pleading.

nonmoving party should be granted the protections of Rule 56"); PBM
Prods., Inc. v. Mead Johnson & Co., 204 F.R.D. 71, 73 (E.D. Va.
2001) (ruling that, "[p]ursuant to the provisions of Rule 12(c),
[the d]efendant's [m]otion is a [m]otion for [s]ummary [j]udgment,
since the [m]otion contemplates matters outside of the pleadings").

When converting a motion to dismiss into a motion for summary
judgment, "[a]ll parties must be given a reasonable opportunity to
present all the material that is pertinent to the [converted]
motion." Fed. R. Civ. P. 12(d). "[T]he term 'reasonable
opportunity' requires that all parties be given some indication by
the [C]ourt that it is treating the 12(b)(6) motion as a motion for
summary judgment, with the consequent right in the opposing party
to file counter affidavits or pursue reasonable discovery." Gay v.
Wall, 761 F.2d 175, 177 (4th Cir. 1985) (alteration and some
internal quotation marks omitted).

In this case, Defendants attached an affidavit and other
exhibits to the Dismissal Motion, i.e. matters "outside the
pleadings, putting [P]laintiff on notice of possible conversion."
Lake v. Astrue, Civ. Action No. 6:11-2107, 2012 WL 3135385, at *2
n.1 (D.S.C. 2012) (citing Fornshill v. Ruddy, No. 95-2490, 89 F.3d
828 (table), 1996 WL 333223, at *2 (4th Cir. June 11, 1996)).
Additionally, pursuant to Roseboro v. Garrison, 528 F.2d 309, 310
(4th Cir. 1975), the Court sent Plaintiff a letter (Docket Entry
35) that notified Plaintiff of his right to respond to the

Dismissal Motion and, "if appropriate, to file affidavits or evidence in rebuttal" (id. at 1). Plaintiff responded with a sworn document (Docket Entry 39) and nine exhibits (Docket Entry 39-2 at 1-9), arguing specifically against the entry of "summary judgment" in Defendants' favor (Docket Entry 39 at 4). The undersigned therefore concludes that Plaintiff has received a reasonable opportunity to present all material relevant to the issue of whether he exhausted his administrative remedies, such that the Court may consider that issue under Rule 56. See Green v. Rubenstein, 644 F. Supp. 2d 723, 739 (S.D. W. Va. 2009) (converting the defendant's motion to dismiss into a motion for summary judgment where the plaintiff-inmate received notice of the requirements for responding to a motion for summary judgment and responded to the motion with a sworn document); see also Herbert v. Saffell, 877 F.2d 267, 270 (4th Cir. 1989) (treating district court's holding as a grant of summary judgment, where "[t]he [plaintiffs] had ample opportunity to bring forth evidence to show that genuine issues of material fact remained"). Under these circumstances, Plaintiff's argument against consideration of Defendants' documentary evidence lacks merit.

### II. Rule 12(b)(6) and Rule 56 Standards

Plaintiff next contends that, because the Complaint withstood PLRA screening, Defendants' arguments in favor of dismissal are "moot." (Docket Entry 39 at 3.) The PLRA allows for sua sponte

judicial screening of all prisoner complaints against government employees to determine whether "the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c)(1); accord 28 U.S.C. § 1915A(a) & (b).[5] Here, as discussed above, the Court should convert the Dismissal Motion into a summary judgment motion on the issue of exhaustion and should apply the summary judgment standard in analyzing that issue. See Fed. R. Civ. P. 56(a) (requiring movant to show entitlement to judgment as a matter of law and that no genuine dispute of material fact exists). Moreover, although the "failure to state a claim" standard, Fed. R. Civ. P. 12(b)(6), applies to the remaining aspects of the Dismissal Motion, the Court's previous PLRA screening does not prevent such analysis, see, e.g., Garewal v. Sliz, 611 F. App'x 926, 931 (10th Cir. 2015) ("Simply put, the fact that a district court does not dismiss a complaint under § 1915A does not mean that the complaint will necessarily withstand a defendant's challenge to its plausibility under Rule 12(b)(6).").

---

[5] Plaintiff also correctly notes that the in forma pauperis statute, 28 U.S.C. § 1915, requires judicial screening and dismissal of a case filed without prepayment of the filing fee if the Court determines it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief," 28 U.S.C. § 1915(e)(2). (See Docket Entry 39 at 3.) The undersigned previously conducted such screening and granted Plaintiff's request to proceed in forma pauperis. (Docket Entry 12; see also Docket Entry 10 (IFP Application).)

Under the Rule 12(b)(6) standard, a plaintiff "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.[6]

Comparatively, under the summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[6] Although the Supreme Court has reiterated that "[a] document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal citation and quotation marks omitted), the United States Court of Appeals for the Fourth Circuit has "not read *Erickson* to undermine *Twombly*'s requirement that a pleading contain more than labels and conclusions," Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (internal quotation marks omitted) (dismissing pro se complaint).

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of a genuine dispute of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and "any factual assertion in the movant's affidavits will be accepted . . . as being true unless the plaintiff submits his own affidavits or other documentary evidence contradicting the assertion," Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992) (internal quotation marks omitted).

"When ruling on a motion for summary judgment, the [C]ourt must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party." Scott v. United States, Civ. Action No. 06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007) (citing Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 438 (4th Cir. 1998)). Additionally, a party may rely on his verified pleadings in opposing a summary judgment motion. See Aloisi v. Morgan, No. 86-6717, 804 F.2d 1250 (table), 1986 WL 18016, at *1 (4th Cir. Nov. 11, 1986) (recognizing that "if [the plaintiff] had filed a verified complaint, he could . . . rely on his pleading in resisting a motion for summary judgment").[7]

_____

[7] Although Plaintiff initially failed to verify the Complaint (see Docket Entry 1), he later filed a document titled "Declaration and Verification by Pro Se Petitioner of Previously filed and served Documents" (Docket Entry 24), attesting to the Complaint "under penalty of perjury" (id. at 1-2).

"While the Court will view the facts and inferences drawn in the light most favorable to the nonmoving party, the party opposing the motion for summary judgment must put forth specific facts showing a genuine issue for trial." Dunn v. Aclairo Pharm. Dev. Grp., 401(K) Plan, No. 1:15-CV-975, 2016 WL 592787, at *2 (E.D. Va. Feb. 10, 2016) (citing Anderson, 477 U.S. at 248). The nonmoving party cannot rest on conclusory allegations or denials, and "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party will not defeat a summary judgment motion. Anderson, 477 U.S. at 252, 256.

### III. The Complaint

This action arises from the "substantial burden" that Defendants allegedly placed upon Plaintiff's exercise of his Islamic religion. (See Docket Entry 1 at 3 ("[ACI] [s]taff place[d] more than a substantial burden upon [Plaintiff's] religious practice" of his Muslim faith, "without a compelling reason.").) According to the Complaint, "[Plaintiff] ha[s] four claims . . .[,] but really it[']s all one. The individual [s]taff members both personally and officially, both singularly and en masse, have created a toxic environment for [n]on-Christian practitioners at [ACI]. That is [Plaintiff's] Claim. ([Plaintiff is] the [n]on-Christian [p]racti[ti]oner)." (Id.)

The Complaint divides the allegations against Defendants into four parts (see id. at 4, 9, 12, 15) and then describes Plaintiff's

resulting injuries and request for relief (id. at 16). The subsections that follow describe Plaintiff's averments in the light most favorable to his position.

### A. "Albemarle Claim 1st Part"

The time ACI allotted for Jumuah qualifies as the "biggest [issue] [Plaintiff] ha[s] ever dealt with [while incarcerated]." (Id. at 4.)[8] The Jumuah issue arises out of the time that Muslims must perform an obligatory Friday prayer. (Id. at 5.) On Defendant Brown's authorization, ACI holds Jumuah during an hour that overlaps with a forbidden prayer time during certain times of the year. (Id. at 5-6.) When Plaintiff dealt with the Jumuah issue at two other prisons, those facilities resolved the timing issue to Plaintiff's satisfaction. (Id. at 4-5; see also id. at 7 (asserting that "the NCDPS Policy Manual states the forbidden prayer times," so "most facilities don't have an issue").) However, when Plaintiff inquired about moving the time that ACI allotted for Jumuah, "programs" reported that it would conflict "with a once a month Catholic service." (Id. at 5.) Plaintiff

---

[8] The Complaint describes "Jumuah" as "Friday or Day of Gathering" (Docket Entry 1 at 4), as well as a service held on Fridays that consists of prayer and a sermon (id. at 8). Practitioners of Islam apparently variously denominate such Friday services as "Jumu'ah, Jum'ah, Jumah, Jumma, Jummah, and Jumuah." McCoy v. Frazier, No. 2:09CV412, 2010 WL 2975747, at *1 n.1 (E.D. Va. July 6, 2010) (unpublished). For purposes of this Memorandum Opinion, Order, and Recommendation, the undersigned adopts Plaintiff's spelling – Jumuah.

13

"asked about the rest of the month, [but] no relief would be forthcoming." (Id. at 5-6.)

Plaintiff further challenges ACI's lack of a "Zakat Fund (Islamic Charity Fund)" (the "Zakat Fund"). (Id. at 6.)[9] Every prison that previously housed Plaintiff operated a Zakat Fund, and "the NCDPS Policy Manual prescribes the Zakat Fund." (Id. at 6-7.) Plaintiff wrote Defendant Clelland about the establishment of a "Zakat [Fund and] he very politely explained [the] denial of [Plaintiff's] request." (Id. at 7 (citing Docket Entry 1-1 at 6).) Despite Defendant Clelland's explanation, Plaintiff requests that ACI "establish a Zakat Fund." (Id. at 16.)

Plaintiff's next issue involves ACI's Islamic inmates who follow a "special diet" during the Ramadan "month of fasting." (Id. at 6.) ACI's Islamic inmates who opt for a "regular diet" receive three meals per day during Ramadan, while ACI's Islamic inmates on a "special diet" only receive two meals per day during Ramadan. (Id.) "Since 1998[,] [Plaintiff has] never been to a facility that did not feed every inmate the same number of meals." (Id.) Plaintiff spoke with the food services manager about the third meal, and he reported that "he would not mind but he can only follow the memo issued by [Defendant Brown] concerning snack bags." (Id. at 7.)

---

[9] "The act of making charitable donations is known as 'Zakat.' It is encouraged by the Muslim faith, particularly during Ramadan." Mincy v. Deparlos, 497 F. App'x 234, 236 n.2 (3d Cir. 2012).

**B. "Albemarle Claim 2nd Part"**

The "2nd Part" of the Complaint takes issue with Defendant
Curry's harassment of Plaintiff about his Islamic faith. (Id. at
9.)  In that regard, during the first week of August 2015,
Plaintiff accepted a job in ACI's kitchen. (Id.)  Before beginning
work, Plaintiff obtained permission "to pray at work and to wear
[his] religious prayer cap (Kufi)."  (Id.)  On August 23 or 24,
2015, Defendant Curry, a kitchen steward, "saw [Plaintiff] praying
in a corner after work hours, [and] when [Plaintiff] finished he
advised [Plaintiff] that [Plaintiff] [was] not allowed to pray or
wear [Plaintiff's] 'white hat' at work." (Id.)  Plaintiff informed
Defendant Curry that the Kufi "was a prayer cap," and that the food
service manager, Mr. Dillingham, allowed Plaintiff to wear his Kufi
and pray at work, "although he did not have to allow [Plaintiff]
that privilege."  (Id.; see also id. at 7 (asserting that Mr.
Dillingham serves as the "food service manager").)

On August 25, 2015, Defendant Curry "asked [Plaintiff] what
[he] thought about God and do[es] [Plaintiff] think [God] has a
hand."  (Id. at 9.)  Plaintiff construed Defendant Curry's question
as a "reference to Jesus Christ," and, after Plaintiff answered,
"[Defendant] Curry smirked and told [Plaintiff] [he] really
need[ed] to accept Jesus Christ as [his] Lord and Saviour."  (Id.)
The next day, Defendant Curry asked Plaintiff if he remembered
their conversation and again told Plaintiff that "[he] need[ed] to

15

accept Jesus Christ as [his] Lord and Saviour and that [he] need[ed] to throw 'that stuff' away if [he] [didn't] want to burn in hell." (Id.)[10]

On September 3, 2015, "[Defendant] Curry in the presence of [another ACI staff member] said to [Plaintiff] that the only 'way to God' is Christ," and "asked [Plaintiff] to ask God to talk to [him] and show [him] the way to Christ." (Id. at 10.) On this occasion, Plaintiff noticed for the first time "that the song [Defendant Curry] s[ang] all the time was a gospel song . . . in reference to the rapture." (Id.)

On September 8, 2015, Plaintiff notified his unit manager about the situation with Defendant Curry and "wrote a grievance." (Id.) The following day, Plaintiff met with Mr. Dillingham and another ACI staff member, and they advised Plaintiff "to continue to pray as long as [his] work [did] not suffer," "to continue to wear [his] prayer cap," and that "[Defendant] Curry would no longer bother [Plaintiff] about [his] faith." (Id. at 11.) Later that same day, during the time that the kitchen inmates eat, "[Defendant] Curry was humming [the same Christian song] without the lyrics." (Id.)

---

[10] Plaintiff submitted the affidavit of inmate Norman Linwood Vassar III who asserts that, on August 26, 2015, he heard Defendant Curry make comments to Plaintiff consistent with Plaintiff's above-quoted account. (See Docket Entry 1-1 at 11.)

On September 11, 2015, Defendant Curry hummed again, and on September 12, 2015, Defendant Curry sang a different gospel song with the lyrics. (Id.) Additionally, Plaintiff was "the last inmate to leave work every night and every night that [Defendant] Curry work[ed] he use[d] the NCDPS computer to listen to [gospel music and sermons]." (Id.)

## C. "Albemarle Claim 3rd Part"

The Complaint's "3rd Part" describes ACI staff's "disdain" for communicating with Muslim inmates and preference for other religions. (Id. at 12-14.) In particular, ACI "allows proselytizers to visit the housing units, day[ ]rooms and dormitories to spread the message of Jesus Christ," "[t]here is a form of Christian service 7 days a week," and "the Chaplain Request Form [h]as a Bible verse on it," but "nothing from other faiths." (Id. at 13.) "There is [also] no sign up sheet for the Christian events" (id.), but ACI requires sign up sheets for Islamic events (id. at 12).[11]

The Complaint further challenges the cancellation of one Jumuah service. (Id. at 13.) Specifically, Defendant Huneycutt moved Jumuah to "visitation" on one occasion when electrical issues

---

[11] That sign up sheet requirement caused some confusion about an Islamic worship service and feast, resulting in some Muslim inmates (other than Plaintiff) missing a worship service. (Docket Entry 1 at 12.) Due to Defendant Huneycutt's absence from work, however, all Muslim inmates "who signed up w[ere] able to attend [the feast]." (Id. at 13.)

17

rendered the Chapel unavailable ("like she does the Christians"), but on another occasion, "[Jumuah] was cancelled" after Plaintiff objected to holding Jumuah in a room that ACI used to train dogs. (Id.)

### D. "Albemarle Claim 4th Part"

The Complaint's "4th Part" involves Plaintiff's request for fingerprinting to facilitate his religious name change. (Id. at 15.) Specifically, Plaintiff needed fingerprinting to "obtain [his] FBI and SBI criminal background checks" and finalize his name change to "Abdul Malik Shakur." (Id.) Defendant Clelland "told [Plaintiff] that he [didn't] mind [Plaintiff] being fingerprinted." (Id.) Despite approving his fingerprinting request and agreeing to fingerprint Plaintiff, ACI staff never followed through with that request. (Id.)

### E. Injuries and Requested Relief

Due to the foregoing events, Plaintiff "stopped wearing [his] religious items" and "praying at work," and "contemplat[ed] shaving [his] beard - just to make life bearable on the outside but [he] feel[s] like [he is] suffocating on the inside. [Plaintiff's] case is not singular at [ACI] but people are afraid the[y] will lose their 'Gain Time' Jobs or lose their promotion to 'Minimum Custody.' [Plaintiff doesn't] need the former and can't get the latter." (Id. at 16.)

18

To remedy such harm, Plaintiff requests:

1. For a real Chaplain to visit once a month (NCDPS Chaplain) to meet with all the faith helpers (there are about 5 faith helpers) of the different faiths, each faith has 1 faith helper[,] [s]o the Chaplain can relay between the Staff and Inmates.
1A[.] To have a Temporary Inunction barring Jumuah in the Dog Training Areas.
2. For the Staff to treat all faiths with equality and respect as it relates to practice.
3. For the Staff to receive training as it relates to sensitivity and the use of State property for personal religious use and proselytizing either by staff or volunteers.
4. Punitive damages in the amount of $5,000[] or other damages in that amount.
5. Compensation of the filing fee $400[] and other court and copying costs.
6. For the Staff to contact Chaplain Abdul Haneef at Foothills C.I. when doctrinal issues occur. The Muslim Chaplain.
7. To not be shipped/transferred during litigation of this action.
8. To be fingerprinted.
9. To not have to pray Jumuah Prayer or Sermon during the forbidden time.
10. For [ACI] to establish a Zakat Fund; as authorized but not mandated.

(Id.)

## IV. Defendants' Arguments and Plaintiff's Responses

### A. Exhaustion of Administrative Remedies

Defendants first argue that, under the PLRA, Plaintiff's "claims related to Muslim services, fingerprints, and the Zakat Fund and as to Defendants Brown, Huneycutt, and Clelland . . . are barred," due to Plaintiff's failure to exhaust his administrative remedies. (Docket Entry 34 at 10 (all-caps and bold emphasis omitted).) In support of that argument, the Couch Affidavit

19

attests that Plaintiff has only exhausted his administrative remedies with regard to his grievances for Defendant Curry's alleged religious harassment (Docket Entry 33-3) and ACI's lack of a Zakat Fund (Docket Entry 33-4). (Docket Entry 33, ¶¶ 7-10.) Defendants further contend that Plaintiff exhausted his Zakat Fund grievance only after he initiated this action, which fails to satisfy the exhaustion requirement. (Docket Entry 34 at 13.) Thus, Defendants argue that Plaintiff has only properly exhausted his administrative remedies with regard to his grievance against Defendant Curry for religious harassment, such that the Court should dismiss all other claims/Defendants for failure to exhaust. (Id. at 10-14.)

In response, Plaintiff maintains that he did not exhaust his administrative remedies with respect to certain of his claims and against certain Defendants because (1) administrative remedies remained unavailable and (2) exhaustion would have proven futile. (Docket Entry 39 at 5-9.)

### i. Availability of Administrative Remedies

According to Plaintiff, (1) available administrative remedies could not provide him any relief for his religious grievances, (2) prison officials thwarted his attempts to pursue administrative remedies, and (3) administrative procedures prevented him from challenging more than one religious issue at a time. (Id.) Defendants have countered that Plaintiff's assertions are "undercut

20

by the fact that [Plaintiff] . . . exhaust[ed] his administrative remedies on [other] occasions related to religious issues." (Docket Entry 40 at 3.)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA," Jones v. Bock, 549 U.S. 199, 211 (2007), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," Porter v. Nussle, 534 U.S. 516, 532 (2002). As a result, an inmate must pursue each step of the established administrative procedure before filing a lawsuit. See Woodford v. Ngo, 548 U.S. 81, 84 (2006) (holding that "proper exhaustion of administrative remedies is necessary" to satisfy the PLRA's exhaustion requirement). The burden lies with the defendant to prove that an inmate failed to exhaust available administrative remedies before filing a claim in court. Jones, 549 U.S. at 216 (concluding that "failure to exhaust is an affirmative defense under the PLRA"). Moreover, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also Lee v. Wiley, 789 F.3d 673, 677 (6th Cir. 2015)

("[A]ll six of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." (internal quotation marks omitted)).

Pursuant to N.C. Gen. Stat. § 148-118.1, the NCDPS provides an administrative remedy procedure for prisoner grievances (the "ARP"). See State of North Carolina Department of Public Safety Prisons, Policy & Procedures, Administrative Remedy Procedure, http://www.doc.state.nc.us/dop/policy_procedure_manual/g300.pdf (last visited Nov. 29, 2016); see also Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (recognizing that the Court "may properly take judicial notice of matters of public record").[12]  The ARP implements a three-step process governing submission and review of inmate grievances. ARP, Ch. G, Section .0310; see also Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008) (outlining the three-step process). "Step 1" of the grievance procedure requires that an inmate submit his grievance on a Form DC-410. ARP, Ch. G, Section .0310(a)(1). The facility head conducts an initial review and issues a response. ARP, Ch. G, Section .0310(a)(5). An inmate may appeal an unsatisfactory response to "Step 2" and then "Step 3" of the ARP. ARP, Ch. G, Section .0310(b)-(c). At Step 3, the executive director of the

---

[12] Citations to the ARP appear as follows: "ARP, Ch. G, Section ___."

IGRB conducts a review of the inmate's grievance and issues a final response, ARP, Ch. G, Section .0310(c), completing exhaustion.

Notably, "[a]n inmate may submit a new grievance [only] after a pending grievance has completed Step 2 review or has been resolved." ARP, Ch. G, Section .0304(b). In exigent circumstances, however, the ARP allows an inmate to submit an "emergency" grievance to bypass this procedural bar that generally prohibits submission of multiple grievances. See ARP, Ch. G, Section .0308(a) ("Emergency grievances shall be defined as matters which present a substantial risk of physical injury or other serious and irreparable harm to the grievant if regular time limits are followed. Emergency grievances shall be forwarded immediately, without substantive review, to the Facility Head, or to the level at which corrective action can be taken."). A grievance may be rejected if "[t]here has been a time lapse of more than ninety (90) days between the alleged event and submission of the grievance," or "[t]he inmate has requested a remedy for another inmate." ARP, Ch. G, Section .0306(c)(2)-(3).

When pursuing such administrative remedies, the PLRA only requires that inmates exhaust "available" remedies. 42 U.S.C. § 1997e(a). Under the PLRA, "available" means "capable of use to obtain some relief for the action complained of." Ross v. Blake, ___ U.S. ___, ___, 136 S. Ct. 1850, 1859 (2016) (internal quotation marks omitted). "The burden of showing that administrative

23

remedies were unavailable lies with the plaintiff." Mann v. Scott, Civ. Action No. 0:14-3474, 2015 WL 5165198, at *2 (D.S.C. Sept. 1, 2015) (citing Graham v. Gentry, 413 F. App'x 660, 663 (4th Cir. 2011) ("[I]n order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure.")). In Ross, the United States Supreme Court recognized three potential situations that render administrative remedies not "available" to a complaining inmate. Id. at ___, 136 S. Ct. at 1859-60.

First, the Supreme Court reasoned that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at ___, 136 S. Ct. at 1859. For instance, "where the relevant administrative procedure lacks authority to provide any relief, the inmate has nothing to exhaust." Id. (internal quotation marks omitted).

Second, the Supreme Court observed that "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id.

24

Third, the Supreme Court deemed administrative remedies unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at ___, 136 S. Ct. at 1860. For example, "officials might devise procedural systems . . . to trip up all but the most skillful prisoners." Id. (brackets and internal quotation marks omitted). The Supreme Court explained that "appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures," and concluded that, "[a]s all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable." Id. (citing in footnote with approval Davis v. Hernandez, 798 F.3d 290, 295 (5th Cir. 2015) (holding that "[g]rievance procedures are unavailable to an inmate if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis omitted)), and Goebert v. Lee Cty., 510 F.3d 1312, 1323 (11th Cir. 2007) (explaining that, if a prison "play[s] hide-and-seek with administrative remedies," then they are not "available")).

Here, Defendants have satisfied their initial burden of establishing that Plaintiff only properly exhausted his administrative remedies utilizing the Form DC-410 with regard to

25

his grievance against Defendant Curry for religious harassment. (See Docket Entry 33, ¶¶ 5-10; see also Docket Entry 33-3 (providing copy of exhausted grievance against Defendant Curry).) The burden thus shifts to Plaintiff to show that administrative remedies remained unavailable, thus excusing the PLRA's exhaustion requirement. See Mann, 2015 WL 5165198, at *2.

Plaintiff's filings establish that at least two of the Supreme Court's noted exceptions to the PLRA's exhaustion requirement may apply in this case. First, Plaintiff has come forward with evidence that the ARP lacked authority to decide religious issues. (See Docket Entry 39 at 5-9.) Specifically, Plaintiff averred that "[he] was instructed by staff at [ACI] ([Defendant] Huneycutt) that the proper form for grieving religious issues was not through the [ARP on a Form DC-410,] but was through a DC-572 Religious Accommodation Request [(the "DC-572 Form")]." (Id. at 5.) Plaintiff further has asserted that, according to the NCDPS Policy and Procedure Manual, "[t]he highest level of [review for] the DC-572 process is [Defendant Brown]" (id.), whereas the IGRB "is the highest review authority of the [ARP]" (id. at 7). According to Plaintiff, the IGRB therefore lacks ultimate authority over religious issues, such that the ARP could not resolve Plaintiff's religious grievances. (See id. at 8 (declaring that the process "specifically designed to handle [religious] issues is through the

26

Director of Chaplaincy Services on a DC-572 [F]orm").)[13]  Construed in the light most favorable to him, Plaintiff has raised a material question of fact regarding whether the ARP lacks authority to resolve religious grievances thus rendering administrative remedies unavailable.  See Ross, ___ U.S. at ___, 136 S. Ct. at 1859 (noting that administrative remedies remain unavailable if the administrative procedure cannot provide relief).

Second, Plaintiff has stated that, after Defendant Huneycutt instructed Plaintiff to grieve his religious issues through a DC-572 Form (Docket Entry 39 at 5), ACI staff would not provide Plaintiff with that form, thus thwarting his attempts to grieve his religious issues (id. at 8 (contending that policy requires the DC-572 Form "be made available upon request," but that the "DC-572 [Form] was not made available upon request to the Plaintiff or other inmates")).[14]  Again, construed in the light most favorable

_____

[13] In support of that contention, Plaintiff provided a letter signed by the Assistant Superintendent of Programs which directs Plaintiff to submit a "proper request form" if he "wish[es] to become a faith leader or make changes to state procedures regarding the Islamic faith services."  (Docket Entry 39-2 at 8.)  That letter does not identify which form ACI's inmates should use to grieve religious issues.  (See id.)  However, in response to Plaintiff's discovery requests, Defendants provided excerpts of the "Policy & Procedures" implemented by the NCDPS that identifies a "DC-572 Request for Religious Assistance" (Docket Entry 36-2 at 9) as the proper procedure for inmates to submit certain religious requests (see id. at 11).

[14] According to Plaintiff, as an alternative to the DC-572 Form, he "used letters to obtain remedies at every level of the process related to religious complaints and received an ultimate and final decision from the highest level possible[,] the Office of

27

to Plaintiff, through their alleged actions of withholding the DC-572 Form, ACI staff prevented Plaintiff from pursuing his administrative remedies, thus rendering such remedies unavailable. See Ross, ___ U.S. at ___, 136 S. Ct. at 1860 (explaining that prison official's use of "machination" and/or "misrepresentation" may render administrative remedies unavailable).

Finally, Plaintiff appears to argue that he filed a grievance challenging the time that ACI allotted for Jumuah "using another inmate[']s name" (the "Jumuah Time Grievance") because the ARP prevents submission of multiple grievances. (Docket Entry 39 at 7; see also Docket Entry 1-1 at 2-3 (providing copy of the Jumuah Time Grievance).) In that regard, Plaintiff evidently would challenge the ARP's requirement that an inmate receive resolution or a Step 2 response to a previously filed grievance before filing a new grievance. (Docket Entry 39 at 6.) Put another way, because Plaintiff could not pursue multiple grievances at the same time, he

---

the Director of Chaplaincy Services, who due to the religious nature of the complaints[,] no-one at the [IGRB] has any authority to overturn." (Docket Entry 39 at 8-9.) If credited, those averments would provide an alternative basis for denial of Defendants' demand for dismissal based on non-exhaustion.

deems the ARP unavailable.[15]  Plaintiff cannot prevail on that
argument.

As an initial matter, the ARP specifically required Plaintiff
to file his grievances in his name.  (See Docket Entry 1-1 at 2
(providing copy of the Form DC-410 that Plaintiff used to file the
Jumuah Time Grievance, which requires that the inmate provide his
name, number, location, signature, and remedy sought)); see also
Moore, 517 F.3d at 721 (noting that the Form DC-410 requires that
the inmate provide his name and signature).  Further, the ARP
generally prohibits an inmate from "request[ing] a remedy for
another inmate."  ARP, Ch. G, Section .0306(c)(3).  Allowing an
inmate to file a grievance in another inmate's name could prevent
prison officials from addressing each inmate's particular grievance
in an effective and efficient manner to avoid litigation, a purpose
behind the PLRA's exhaustion requirement.  See generally Porter,
534 U.S. at 524-25 (noting that, "[b]eyond doubt, Congress enacted
§ 1997e(a) to reduce the quantity and improve the quality of

---

[15] Plaintiff takes particular issue with three ARP provisions
requiring that:  (1) a "previous 'grievance' must complete [S]tep
2 before another can be filed," (2) "no more than 90 days can
elapse between the event and the submission of a grievance," and
(3) "only one event can be considered [at a time]."  (Docket Entry
39 at 6.)  According to Plaintiff, these three rules forced him to
file the Jumuah Time Grievance in another inmate's name because at
the time he filed that grievance, he had a previously filed
grievance pending that had not yet reached resolution or Step 2 of
the ARP.  (See id. at 7.)  Plaintiff thus argues that "[t]hese
three [rules] make it impossible or at least improbable that use of
the [ARP] is sufficient to address multiple issues."  (Id. at 6-7.)

prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case").

Additionally, even assuming, _arguendo_, that Plaintiff could properly pursue the Jumuah Time Grievance through the ARP, if the Jumuah Time Grievance qualified as time sensitive, channels remained open for Plaintiff to file an "emergency" grievance, which would receive immediate review. _See_ ARP, Ch. G, .0308 (describing procedures for submitting emergency grievance); _see also_ _Moore_, 517 F.3d at 729-30 (recognizing that the plaintiff-inmate could have filed an "emergency grievance" to bypass the ARP's procedural bar preventing an inmate from filing a second grievance before his previously filed grievance achieved resolution or completed Step 2 of the ARP). For these reasons, Plaintiff's argument that the ARP's restrictions on simultaneous pursuit of multiple grievances rendered administrative remedies unavailable lacks merit. _See_ _Porter_, 534 U.S. at 524 (explaining that, under the PLRA, a prisoner must exhaust all available administrative remedies, whether or not they "meet federal standards," or are "plain, speedy, and effective" (internal quotation marks omitted)); _see also_ _Ross_, ___ U.S. at ___, 136 S. Ct. at 1856 (recognizing that, aside from the exception that "remedies must indeed be 'available' to the prisoner," "the PLRA's text suggests no limits on an inmate's obligation to exhaust").

Despite the deficiencies in Plaintiff's final argument regarding exhaustion, a reasonable fact-finder could conclude that the ARP could not provide administrative remedies for Plaintiff's religious grievances, and that ACI staff thwarted Plaintiff's attempts to pursue his administrative remedies. For these two reasons, the Court should deny without prejudice the Dismissal Motion on the issue of whether Plaintiff properly exhausted his administrative remedies before filing this lawsuit. See Ross, ___ U.S. at ___, 136 S. Ct. at 1859 (concluding that, when one or more circumstances arise in which an administrative remedy, "although officially on the books, is not capable of use to obtain relief," the "inmate's duty to exhaust 'available' remedies does not come into play"); Patel v. Moron, 897 F. Supp. 2d 389, 399 (E.D.N.C. 2012) (denying without prejudice the defendants' summary judgment motion alleging that the plaintiff-inmate failed to exhaust his administrative remedies, where the plaintiff-inmate asserted that prison officials thwarted his attempts to pursue administrative remedies by, inter alia, refusing to provide him with grievance forms).[16]

---

[16] As the Fifth Circuit has explained, "[w]hen the defendant raises exhaustion as an affirmative defense, the judge should usually resolve disputes concerning exhaustion prior to allowing the case to proceed to the merits. If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary." Dillon, 596 F.3d at 273 (footnote omitted); see also Lee, 789 F.3d at 678 ("[T]he disputed issues of fact regarding exhaustion under the PLRA present[] a matter of judicial

31

## ii. Futility of Administrative Remedies

Plaintiff next contends that the denial of the Jumuah Time Grievance meant that "no remedy [was] available" because, under the ARP, all similarly filed grievances receive the same result. (Docket Entry 39 at 6.) Additionally, Plaintiff has averred that, "[f]or all intents and purposes[,] the [ARP] is completed at [S]tep 2" because "there is no remedy available for regular grievances at Step 3." (Id. at 8.) More specifically, at Step 3 of the ARP, "regular inmate grievances (those that are not requested by the NCDPS Secretary to be investigated) receive . . . [only] an acknowledgment that appears on every regular grievance that 'staff adequately addressed [the] inmate's concern.'" (Id.) In other words, Plaintiff argues that filing a grievance, merely to receive the same response that another inmate previously received, and/or reaching Step 3 of the ARP just to receive a perfunctory acknowledgment, both qualify as futile measures that should relieve him of the PLRA's exhaustion requirement. (Id. at 6.)[17]

---

administration that c[an] be decided in a bench trial."). "In many cases, the judge will be able to rule on exhaustion without allowing any discovery. However, in some cases, unique circumstances may arise that necessitate allowing some discovery prior to ruling, such as where the availability of administrative remedies is contested." Id. at 273 n.4. In this case, the parties already have conducted discovery and, to the extent any claims survive summary judgment on the merits, the Court can resolve any remaining exhaustion-related issues via evidentiary hearing/bench trial before or in conjunction with any trial on the merits.

[17] The ARP expressly provides that, "[i]f more than one inmate files a grievance concerning the application of general policies or

Courts have consistently held that the PLRA's exhaustion requirement "is mandatory" and that "courts have no discretion to waive the requirement," "even where exhaustion may be considered futile or inadequate." Johnson v. Ozmint, 567 F. Supp. 2d 806, 814 (D.S.C. 2008) (citing Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998) (rejecting plaintiff-inmate's argument that he need not exhaust his administrative remedies that "are futile and inadequate")); see also Porter, 534 U.S. at 524 (observing that, "[e]ven when the prisoner seeks relief not available in grievance proceedings, . . . exhaustion is a prerequisite to suit"). Because futility does not excuse exhaustion under the PLRA, see id., Plaintiff's arguments regarding futility fail.[18]

---

practices, or acts arising out of the same incident, these grievances will be processed as a group. Each grievance shall be logged in individually; however, the same response will be provided to each grievant." ARP, Ch. G, Section .0304(c) (emphasis added). As discussed above, the ARP also provides that each inmate grievance must complete Step 3 to achieve exhaustion. ARP, Ch. G, Section .0310(c)(6).

[18] Plaintiff further contends that he won his grievances regarding "[f]ingerprints" and the "Zakat Fund," and that "[c]ourts have said that if you 'win' your grievance before the final stage [of the ARP] then you have exhausted [your administrative remedies], since it makes no sense to appeal if you won." (Docket Entry 39 at 7 (citing no cases for that proposition).) Despite those contentions, Plaintiff asserts that "the facility decided to make decisions in the near future" regarding the Zakat Fund (id.), but never established a Zakat Fund (see Docket Entry 1 at 16 (requesting that the Court compel ACI to establish a Zakat Fund), and that "the facility approved fingerprinting" (Docket Entry 39 at 7), but never provided him fingerprinting (id. at 13). It thus appears that the ARP remained available for Plaintiff to pursue other administrative remedies (i.e. appeal these initial responses to Step 2 and Step 3) to obtain a more satisfactory resolution. As

33

## B. Plaintiff's Transfer Moots Requests for Injunctive Relief

According to Defendants, Plaintiff transferred from ACI to "Caswell CC," rendering moot his requests for injunctive relief, as "he is no longer subject to the challenged conditions or burdens at [ACI]." (Docket Entry 34 at 23; see also Docket Entry 34-1 (showing that prison officials transferred Plaintiff from ACI to Caswell CC on June 14, 2016).) In response, Plaintiff has conceded the fact of his transfer, but asserts that Defendant Brown's decisions affect every North Carolina prison (Docket Entry 39 at 12; see also id. at 1 (identifying Plaintiff's new address at Caswell CC)), as she remains the final arbiter of all religious grievances (id. at 5 ("The highest level of the DC-572 process is [Defendant Brown], the Director of Chaplaincy Services.").

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." Powell v. McCormack, 395 U.S. 486, 496 (1969). For instance, an inmate's transfer to a separate prison facility moots his requests for injunctive relief, so long as the transfer

_____

a result, Plaintiff's alleged wins at the initial level of review failed to satisfy the PLRA's exhaustion requirement. See generally Jones, 549 U.S. at 211 ("There is no question that . . . unexhausted claims cannot be brought in court."). The undersigned further notes that, to the extent Plaintiff contends that he received a satisfactory outcome in the administrative process, such results would seemingly moot any need for relief in federal court. See generally Porter, 534 U.S. at 525 (recognizing that, "[i]n some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation").

34

prevents the inmate from encountering those same allegedly unconstitutional prison conditions that gave rise to his original grievances. See, e.g., West v. Grams, 607 F. App'x 561, 566 (7th Cir. 2015) (noting that "a prison transfer might moot a claim for injunctive relief if the transfer means that the inmate no longer is laboring under the allegedly unconstitutional policy or practice"); Wright v. Bennett, Civ. Action No. 5:08-CT-3129, 2010 WL 3075519, at *3 (E.D.N.C. Aug. 4, 2010) (explaining that "[t]he Fourth Circuit has consistently held that when a prisoner is no longer subject to the alleged unconstitutional condition, the claim is moot," and citing cases); see also Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987) (observing that, "[b]ecause the prisoner has been transferred, his request for injunctive relief is moot" (citing Weinstein v. Bradford, 423 U.S. 147 (1975)).[19] "[T]hat is not the case," however, where the inmate challenges a system-wide policy that applies "wherever [the inmate] is next sent until his release." West, 607 F. App'x at 566.

Here, the record reveals that, since 2007, Plaintiff has been housed at 9 different prisons, and has never served time at the same prison twice. (See Docket Entry 1 at 4.) Given that pattern and the fact that Plaintiff only faces two more years of

---

[19] "[E]ven if a plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiff may be 'entitled to at least nominal damages.'" Rendelman v. Rouse, 569 F.3d 182, 187 (4th Cir. 2009) (quoting Covenant Media of S. C., LLC v. City of N. Charleston, 493 F.3d 421, 429 n.4 (4th Cir. 2007)).

35

incarceration (Docket Entry 34-1 at 1 (identifying Plaintiff's projected release date as July 2, 2018)), he cannot establish a likelihood of return to ACI; that consideration generally supports a finding of mootness. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (concluding that the inmate's transfer to another prison rendered moot his claims for declaratory and injunctive relief, "since he is unlikely to return to [that prison]"). Moreover, Plaintiff's transfer from ACI to Caswell CC renders moot each of his requests for injunctive relief because (as explained below) none of those requests involve system-wide policies. See West, 607 F. App'x at 566 (holding that transfer moots prisoner's requests for injunctive relief, so long as the request does not challenge a system-wide policy that would still affect the prisoner at his new facility).

First, Plaintiff's requests for injunctive relief involving ACI's staff do not purport to address any problem existing throughout the state prison system. (See Docket Entry 1 at 16 (requesting "a real chaplain to visit once a month (NCDPS Chaplain) to meet with all the faith helpers (there are about 5 faith helpers) of the different faiths, each faith has 1 faith helper[,] so the chaplain can relay between the staff and inmates," "[f]or the staff to treat all faiths with equality and respect as it relates to practice," "[f]or the staff to receive training as it relates to sensitivity and the use of State property for personal

36

religious use and proselytizing either by staff or volunteers," "[f]or the staff to contact Chaplain Abdul Haneef [(the Muslim Chaplain)] at Foothills C.I. when doctrinal issues occur"). Because Plaintiff will no longer encounter ACI's staff, requiring them to undergo religious training will provide Plaintiff no relief. Moreover, according to Plaintiff, the discrimination at ACI "is not a system wide policy" (id. at 3), and "[t]he few religious issues that [he] experienced at previous facilities were dealt with appropriately by the administration (whether or not [he] agreed with their decision)" (id. 4). In short, Plaintiff's transfer away from ACI precludes interaction with Defendant Curry or any other ACI staff member, and thus removes the possibility of any future religious harassment of Plaintiff by ACI's staff.

Second, due to Plaintiff's transfer to Caswell CC, he will no longer attend religious services at ACI, mooting his request for an injunction barring ACI from holding Jumuah in the dog training areas (id. at 16). In that regard, Plaintiff does not allege that any other prison facilities have ever attempted to hold Jumuah in a dog training area. (See id. at 1-16.)

Third, Plaintiff asked "[t]o not be shipped/transferred during litigation of this action." (Id. at 16.) However, Plaintiff states in his Supplemental Pleading that he requested a transfer to Caswell CC and "is content to remain" there (Docket Entry 39 at 15), mooting any demand for the Court to prohibit his transfer.

37

Fourth, the Complaint requested fingerprinting to facilitate Plaintiff's religious name change (Docket Entry 1 at 15-16), but he now has asserted that his "name was legally changed . . . without him ever being fingerprinted by [ACI] staff" (Docket Entry 39 at 13). <u>See also</u> Docket Entry 39-2 at 1 (confirming Plaintiff's name change).) Because Plaintiff only sought fingerprinting to facilitate his name change, he no longer needs fingerprinting.

Fifth, with regard to Plaintiff's request "[t]o not have to pray Jumuah prayer or sermon during the forbidden time" (<u>id.</u> at 16), Plaintiff has not alleged that Caswell CC holds Jumuah during a forbidden time (<u>see</u> Docket Entry 39). In addition, Plaintiff asserts that he previously raised this issue with prison staff at two other prisons, and that both of those prisons satisfactorily altered the time of Jumuah so that the service did not overlap with a forbidden prayer time. (Docket Entry 1 at 4-5.) The Complaint further states that "[m]ost prisons understand [the forbidden prayer times] and so Jumuah is from 1:30-2:30 pm year round no problems." (<u>Id.</u> at 5.) Under these circumstances, Plaintiff cannot show that holding Jumuah during a forbidden time qualifies as a system-wide policy that would affect him at Caswell CC.

Sixth, with regard to Plaintiff's request for ACI "to establish a Zakat Fund" (<u>id.</u> at 16), the Complaint alleges that "every prison [Plaintiff has] ever been to," other than ACI, provided a Zakat Fund (<u>id.</u> at 6; <u>see also</u> <u>id.</u> at 4 (asserting that

38

Plaintiff has "been to 15 prisons since 1998")), and that "the NCDPS Policy Manual prescribes the Zakat Fund" (id. at 7). Accordingly, Plaintiff cannot establish that he will lack access to a Zakat Fund at Caswell CC.[20]

In sum, Plaintiff's transfer to Caswell CC moots each of the Complaint's requests for injunctive relief.

### C. RLUIPA Claim(s) Fail(s) as a Matter of Law

Defendants further contend that, because Plaintiff's transfer to Caswell CC moots his requests for injunctive relief, Plaintiff's RLUIPA claim fails as a matter of law. (Docket Entry 34 at 23-24.)

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates" that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Under RLUIPA, "Government" includes any official of

---

[20] Regarding the Complaint's assertion that ACI's Muslim inmates observing a "special diet" only receive two meals per day during Ramadan (rather than three) (Docket Entry 1 at 6), the Complaint fails to request any specific injunctive relief regarding that issue (see id. at 1-16). Moreover, the Complaint declares that, "[s]ince 1998[,] [Plaintiff has] never been to a facility that did not feed every inmate the same number of meals" during Ramadan. (Id. at 6.) Accordingly, Plaintiff has neither requested nor shown entitlement to injunctive relief for ACI's alleged failure to provide Muslim inmates operating under a special diet three meals per day during Ramadan.

a "State, county, municipality, or other governmental entity created under the authority of a State" and "any other person acting under color of State law." 42 U.S.C. § 2000cc-5(4)(A). Notably, however, the Fourth Circuit has held that RLUIPA only authorizes injunctive relief against a state official, whether sued in his/her individual or official capacity. Wall v. Wade, 741 F.3d 492, 496 n.5 (4th Cir. 2014) ("We note at the forefront that Congress did not authorize damages claims against state officials under RLUIPA. *See Sossamon v. Texas*, [563] U.S. [277, 284-88], 131 S. Ct. 1651, 1658-59, 179 L.Ed.2d 700 (2011) (prohibiting damages claims against state officials in their official capacity); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity). Therefore, the plaintiff's only potential remedies under RLUIPA are equitable.").[21]

---

[21] According to the Fourth Circuit, when analyzed under Congress's spending clause authority, see 42 U.S.C. § 2000cc-1(b) (stating that RLUIPA applies in any case in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance"), RLUIPA does not authorize claims for money damages against a state official in his or her individual capacity. Rendelman, 569 F.3d at 188-89. The Rendelman Court recognized, however, that "RLUIPA also purports to have an independent commerce clause basis," id. at 189 (citing 42 U.S.C. § 2000cc-1(b) (providing that RLUIPA applies whenever "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes")), leaving open the question of whether RLUIPA, "analyzed under the commerce clause, would authorize individual capacity damage actions," id. Nonetheless, the Complaint in this case fails to demonstrate in any respect that the alleged substantial burden on Plaintiff's religious practice affects (or that the removal of that alleged substantial burden would affect) interstate commerce. (See Docket Entry 1.) Consequently, the

Here, the Complaint alleges that, at all times relevant, Defendants worked as officers with a state prison and the NCDPS, and interacted with Plaintiff under color of state law. (See Docket Entry 1 at 1-3.) Defendants thus qualify as "government" under RLUIPA. See 42 U.S.C. § 2000cc-5(4)(A). However, because RLUIPA does not authorize money damages against Defendants, see Wall, 741 F.3d at 496 n.5, Plaintiff's RLUIPA claim(s) only entitle(s) him to injunctive relief. As discussed above, Plaintiff's transfer to Caswell CC moots each of his requests for injunctive relief. Accordingly, Plaintiff's RLUIPA claim(s) fail(s) as a matter of law. See Oliver v. Butler, Civ. Action No. 5:12-CT-3157, 2015 WL 847428, at *5 (E.D.N.C. Feb. 26, 2015) (granting summary judgment in favor of the defendants on the plaintiff-inmate's RLUIPA claim because transfer rendered moot his requests for injunctive relief and RLUIPA "does not authorize claims for official or individual capacity monetary damages").

---

Complaint fails to "present a factual basis for a claim of monetary damages under the Commerce Clause nexus of RLUIPA." Rountree v. Clarke, No. 7:15CV220, 2016 WL 324491, at *3 (W.D. Va. Jan. 26, 2016) (rejecting plaintiff-inmate's argument that the denial of accommodation of her daily yoga requirements substantiates a RLUIPA claim under Congress's Commerce Clause authority) (citing Rendelman, 569 F.3d at 189 (indicating that RLUIPA claim under the Commerce Clause provision would require specific factual connection to alleged burden on an inmate's religious exercise); see also Malik v. Ozmint, 2010 WL 1052660, at *7 n.15 (D.S.C. Mar. 19, 2010) (concluding that because "the [p]laintiff does not allege that the [d]efendants' actions affected interstate commerce . . . it must be assumed that RLUIPA applies to the [d]efendants based on [the State corrections department's] receipt of federal funds," and that, "[a]s such, money damages are unauthorized in this action").

## D. Official Capacity Damages Claims Fail as a Matter of Law

"[A] suit for damages against a state official in his official capacity is actually a suit against his office and, thus, the State." Eller v. Kaufman, No. 2:11CV31, 2012 WL 3018295, at *8 (W.D.N.C. July 24, 2012) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)). Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. The State does not qualify as a "person" within the meaning of Section 1983. Will, 491 U.S. at 64-66.

As discussed above, the Complaint alleges that all Defendants worked as officers with a state prison and the NCDPS. (See Docket Entry 1 at 1-3.) Because a suit against Defendants in their official capacities thus qualifies as a suit against the State, and the term "person" under Section 1983 does not encompass the State, Plaintiff may not maintain a Section 1983 claim for damages against Defendants in their official capacities. See Eller, 2012 WL 3018295, at *8-9 (observing that the defendant "is a detention officer with the North Carolina Department of Corrections, and a suit for damages against a state official in his official capacity is actually a suit against his office and, thus, the State," and

42

holding that "the State is not a 'person' within the meaning of Section 1983 and, therefore, [the p]laintiff may not maintain a Section 1983 claim for damages against [the defendant] in his official capacity"); see also Kentucky v. Graham, 473 U.S. 159, 169 (1985) ("The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (internal footnote and citation omitted)). Plaintiff's Section 1983 official capacity claims for monetary damages thus fail as a matter of law.

## E. Failure to State a Claim/Qualified Immunity as to Defendant Curry

Finally, Defendants contend that the Complaint fails to state a claim against Defendant Curry, and that qualified immunity protects him from liability. (Docket Entry 34 at 14-21.)[22] In response, Plaintiff argues that the Dismissal Motion "should have been filed before [Defendants] filed an [a]nswer as it regards [q]ualified [i]mmunity and surely before 'commencement of discovery'" (Docket Entry 39 at 11), and that Defendant Curry's actions are not entitled to qualified immunity as he "put

_____

[22] Although Defendants assert that the Complaint's "allegations fail to state a claim for relief against them," and "that they are entitled to qualified immunity" (Docket Entry 34 at 3), their failure to state a claim and qualified immunity arguments focus solely on Plaintiff's allegations against Defendant Curry (id. at 14-21).

substantial pressure on the Plaintiff to modify his behavior and religious practice" (id. at 10). Plaintiff further maintains that "[Defendant] Curry's comments (especially as a prison guard and work supervisor for the only prison job offering 17 days off a prison sentence every month)" represented a "substantial burden." (Id.) Put another way, Plaintiff contends that "[a] prison supervisor who can affect an inmate[']s release date holds a substantial amount of power; . . . a single infraction meant loss of a job[.] [Thus,] [a] simple request by such a supervisor represents a substantial burden." (Id. at 11.)[23]

With regard to Plaintiff's contention that Defendants should have filed the Dismissal Motion raising their qualified immunity defense before they answered and/or before the parties engaged in discovery (id.), Defendants in fact asserted a qualified immunity defense in their Answer (Docket Entry 26 at 11) and first dispositive motion (Docket Entry 34 at 20-21). In any event, no requirement exists that Defendants assert their qualified immunity defense before answering the Complaint, see generally Fed. R. Civ. P. 8(b)-(c) (describing requirements for responding to a pleading, including procedures for asserting defenses), and Defendants put Plaintiff on notice of said defense before he requested discovery (compare Docket Entry 26 (Answer filed April 21, 2016), with Docket

---

[23] Plaintiff, however, "does not seek to recover damages under the theory of: Responde[a]t Superior or Supervisory Liability." (Docket Entry 39 at 12.)

Entry 36-1 (Plaintiff's discovery requests dated April 26, 2016, and May 1, 2016)).

Turning next to the merits of Defendants' failure to state a claim and qualified immunity arguments, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Brown v. Gilmore, 278 F.3d 362, 366-67 (4th Cir. 2002) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The Supreme Court has directed that 'qualified immunity questions should be resolved at the earliest possible stage of a litigation.'" Smith v. Reddy, 101 F.3d 351, 357 (4th Cir. 1996) (quoting Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987)). In analyzing qualified immunity, the Court must consider (1) "whether a constitutional violation occurred," and (2) "whether the right violated was 'clearly established' at the time of the official's conduct." Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013). The Court possesses discretion to address either prong first. Pearson, 555 U.S. at 236.

Here, with regard to the first prong, the Complaint alleges that Defendant Curry violated Plaintiff's rights under the Free

45

Exercise Clause of the First Amendment by placing a substantial burden on Plaintiff's religious practice of his Islamic faith. (See Docket Entry 1 at 9-11.)  As outlined in Section III.B. above, the Complaint asserts that, while serving as "kitchen steward," Defendant Curry ordered Plaintiff not to wear his Kufi or pray at work, even though ACI food service manager, Mr. Dillingham, had already given Plaintiff permission "to do both."  (Id. at 7, 9.) The Complaint also asserts that, on three occasions, Defendant Curry made derogatory remarks to Plaintiff about his Islamic faith and/or attempted to convert Plaintiff to Christianity.  (Id. at 9-10.)  The Complaint further states that Defendant Curry sang gospel music in Plaintiff's presence.  (Id. at 10.)

According to the Complaint, this alleged harassment occurred over an approximate 17-day period.  (Id. at 9-11.)  The Complaint asserts that, when Plaintiff reported the harassment to his unit manager (id. at 10), Mr. Dillingham and another ACI staff member met with Plaintiff the following day and "advised [Plaintiff] that [Defendant] Curry would no longer bother [Plaintiff] about [his] faith," to continue wearing his Kufi, and to continue praying as long as his work did not suffer (id. at 11).  The Complaint does not allege that, after that meeting, Defendant Curry continued his religious harassment of Plaintiff, but only alleges that Defendant Curry, in Plaintiff's presence, hummed and sang gospel music in the workplace and played gospel music and sermons on the work computer.

46

(Id.)  Lastly, in the Complaint's description of injuries, Plaintiff asserts that he stopped wearing his religious items and stopped praying at work.  (Id. at 16.)

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  At its core, that clause "forbids the adoption of laws designed to suppress religious beliefs or practices."  Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001) (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 523 (1993)).  In order to establish a claim under the Free Exercise Clause, a plaintiff must show that (1) he sincerely holds his religious beliefs, and (2) his claim stems from that religious belief and not "purely secular" concerns.  McManus v. Bass, No. 2:05CV117, 2006 WL 753017, at *4 (E.D. Va. Mar. 22, 2006) (citing Wisconsin v. Yoder, 406 U.S. 205, 215–16 (1972)).

Once a plaintiff makes the foregoing showing, he must next demonstrate that his religious exercise "has been substantially burdened."  Brown v. Ray, 695 F. Supp. 2d 292, 300 (W.D. Va. 2010) (internal quotation marks omitted); see also Van Wyhe v. Reisch, 581 F.3d 639, 657 (8th Cir. 2009) (holding that the plaintiff-inmate's RLUIPA claim fails because "he has not asserted facts from which a juror could conclude that the denial of additional *group* time to study [Hebrew] places a substantial burden on his religious

47

exercise," and that, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well"). A substantial burden on religious exercise occurs when a state or local government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981), or forces a person to "choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand," Sherbert v. Verner, 374 U.S. 398, 404 (1963). Generally, single or isolated incidents do not place a substantial burden on an inmate's exercise of his religion. Davis v. Doe, No. 1:14CV373, 2014 WL 1835853, at *2 (M.D.N.C. May 8, 2014) (causing the plaintiff to miss part of a single religious service did not qualify as violation of Free Exercise Clause because "single or isolated incidents do not place a substantial burden on an inmate's exercise of religion") (citing Brown v. Graham, 470 F. App'x. 11, 15 (2d Cir. 2012) (affirming decision that failure to provide a kosher meal on one occasion did not rise to the level of a substantial burden on an inmate's religion))).

Upon a Plaintiff's establishment of a substantial burden, a defendant must show that the infringement reasonably relates to a

48

legitimate penological interest.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) ("To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.").  In making that determination, courts should consider:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006) (quoting Turner v. Safley, 482 U.S. 78, 89-92 (1987)).

Here, Defendants fail to challenge the sincerity of Plaintiff's Islamic religious beliefs of wearing his religious items and praying at work.  (See Docket Entries 34, 40.)  Based on the Complaint, both appear central to Plaintiff's Islamic faith.  (See Docket Entry 1 at 5 (asserting that Muslims must pray at least five times per day according to the position of the sun), 9 (averring that Plaintiff "[is] never seen without [his] prayer cap

49

on," as "[i]t is the first thing [he] put[s] on and the last thing [he] take[s] off").)  Furthermore, Plaintiff's claims against Defendant Curry remain rooted in his religion (i.e. wearing religious items, praying at work, and avoiding proselytization). (See id. at 9-11.)

Defendants, however, maintain that Defendant Curry's actions did not rise to the level of a substantial burden because "Plaintiff does not indicate whether or not he continued to wear his kufi and pray while at work or how exactly [Defendant] Curry substantially burdened his ability to practice his faith." (Docket Entry 34 at 19.)  In that regard, when Defendant Curry ordered Plaintiff to stop praying and wearing his Kufi at work, the Complaint alleges that Plaintiff told Defendant Curry that he had permission to do both, and that Plaintiff later confirmed that permission a second time with Mr. Dillingham.  (See Docket Entry 1 at 9-11.)  Even if (at some point) Plaintiff stopped praying and wearing his Kufi at work, such action does not represent a plausible response to a substantial burden imposed by state action, as Plaintiff twice received permission from Defendant Curry's superior(s) to pray and wear his Kufi at work.  (See id. at 9-11.)

Further, after Plaintiff received Mr. Dillingham's second confirmation to continue praying and wearing his Kufi, Defendant Curry ceased harassing Plaintiff.  (See id. at 11 (asserting no more proselytization or orders to stop praying or wearing a Kufi at

work after Plaintiff met with Mr. Dillingham, but only that Defendant Curry continued to hum and sing gospel music, and played sermons and gospel music on the work computer).) The period of Defendant Curry's alleged religious harassment (i.e. proselytization and issuing a one-time order to not pray or wear a Kufi at work) thus occurred over a period of approximately 17 days. (See id. at 9-11.) Such brief and abandoned conduct does not constitute a substantial burden on Plaintiff's religious exercise. See Canell v. Lightner, 143 F.3d 1210, 1212, 1215 (9th Cir. 1998) (finding no substantial burden where inmate only alleged that on some occasions (over a maximum of 18 days) the prison official's "mock-preaching and espousal of religious views interfered with [the inmate's] efforts to pray," because even though "evangelizing may have constituted an intrusion upon [the inmate's] prayers . . . during the brief period involved, . . . these intrusions were 'relatively short-term and sporadic' and did not constitute a substantial interference"); see also Pfeil v. Lampert, 11 F. Supp. 3d 1099, 1111 (D. Wyo. 2014) (rejecting contention that a single missed visit with a minister constituted a substantial burden); Mubashshir v. Moore, No. 3:10 CV 2802, 2011 WL 1496670, at *6 (N.D. Ohio Apr. 19, 2011) (concluding that the inmates' "First Amendment rights were not violated" because denying them "services in the chapel on two occasions" qualified as "isolated instances," and collecting cases to support proposition that "[i]solated acts or

51

omissions . . . do not constitute a substantial burden on religious freedom").

To put it another way, although Defendant Curry's actions may have constituted an annoyance, his actions (particularly in light of Mr. Dillingham's intervention) did not force Plaintiff to disobey his religious precepts or engage in conduct that seriously violated his religious beliefs. See Johnson v. Laham, No. 91-7296, 9 F.3d 1543 (table), 1993 WL 469160, at *3 (4th Cir. Nov. 15, 1993) ("Verbal harassment or abuse by prison officials in itself does not state a constitutional deprivation under section 1983."). The Complaint therefore fails to establish that Defendant Curry's actions amounted to a substantial burden on Plaintiff's religious exercise, as required to establish a constitutional violation. Because the Complaint's allegations fail to demonstrate that Defendant Curry violated Plaintiff's constitutional rights, qualified immunity protects Defendant Curry from liability.[24]

## CONCLUSION

Defendants belatedly answered Plaintiff's discovery requests, rendering the Discovery Motion moot. In addition, Plaintiff has provided sufficient evidence to create a genuine dispute of material fact as to whether he failed to exhaust available

---

[24] In light of the above conclusion, the Court need not consider the second prong of the qualified immunity analysis (i.e. "whether the right violated was 'clearly established' at the time of the official's conduct," Williams, 716 F.3d at 805).

52

administrative remedies as mandated by the PLRA; Plaintiff's transfer to Caswell CC moots his requests for injunctive relief, warranting dismissal of his RLUIPA claim(s); Plaintiff's claims for damages against Defendants in their official capacities fail as a matter of law; and Defendant Curry has shown entitlement to qualified immunity.[25]

**IT IS THEREFORE ORDERED** that Plaintiff's Discovery Motion is **DENIED as MOOT,** but without prejudice to his right to seek any other discovery-related relief to which he can show entitlement.

**IT IS FURTHER RECOMMENDED** that Defendants' Dismissal Motion (Docket Entry 32) be granted in part and denied in part, in that the existence of a material factual dispute regarding exhaustion precludes summary judgment in Defendants' favor on that issue; Plaintiff's requests for injunctive relief and thus his RLUIPA claim(s) fail(s) on grounds of mootness; Plaintiff's official

---

[25] Accordingly, the remaining claims in this action appear to include only Plaintiff's individual capacity, federal constitutional damages claims against (1) Defendant Clelland for not establishing a Zakat Fund and for not honoring Plaintiff's fingerprint request (Docket Entry 1 at 6, 15); (2) Defendant Huneycutt for cancelling a single Jumuah service and for scheduling Jumuah during a forbidden time (id. at 4-6, 13); and (3) Defendant Brown for allowing ACI to hold Jumuah during a forbidden time and for issuing a memorandum that ordered ACI staff not to provide Muslim inmates operating under a special diet with three meals per day during Ramadan (id. at 4-8).

53

capacity damages claims fail as a matter of law; and Defendant

Curry enjoys qualified immunity.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

November 30, 2016